All right, the final case on the docket today is 2-24-0599, Jordan Blanton v. Blanton v. Mastin, as the next turn for James Mastin, Blanton v. Appellee, the Illinois High School Association, defendant, felon. Arguing on behalf of the felons, Mr. Sennett v. Sennett, arguing on behalf of the Appellee, Mr. Timothy v. Brandt. All right, gentlemen, are you both ready to proceed? Yes, Your Honor. And counsel, when you're ready. Good afternoon, and may it please the Court. This Court should reverse the September 6, 2024 judgment on the plaintiff's complaint for declaratory relief for three reasons. First, the Circuit Court was wrong to raise a theory that the plaintiffs never brought, and then find under that theory that Jimmy Mastin was not a, quote, student athlete, quote, under the IHSA's anti-recruitment rule, Bylaw 3.072. Second, the Circuit Court further erred by looking to certain defined terms in a penalty bylaw, that's Bylaw 6.010, and then using those terms to work backwards and find that no recruiting violation had occurred. And third, on the theory of declaratory relief that the plaintiffs did bring in their complaint, it was not arbitrary and capricious for the IHSA Board of Directors to find that the mother of the high school wrestling coach was a school-connected person for purposes of the housing and guardianship arrangement provided to Jimmy Mastin here. I'd like to first turn to the At the joint trial conference, the joint trial conference memorandum states that the IHSA has represented that it believes the plain language of the IHSA bylaw that the mother of the wrestling coach is a school-connected person under Subpart 3.0725 and Bylaw 3.070. The further states that the IHSA is not aware of, quote, any additional information that established any association or connection between Stacy Blanton and Marion Catholic Central High School other than being the mother of Coach Blanton. That's correct. That's it. That's the only evidence. Correct. And if you go back and look at the administrative hearing, which was provided to the circuit court as a trial exhibit, there was lengthy testimony, for lack of a better word, but a presentation about the circumstances that led to the housing and guardianship arrangement. Coach Blanton's, he coached Jimmy Mastin in some summer events in June and July of that year, around the time that the housing and guardianship arrangement was being finalized between the families. But in terms of, for example, we know No credibility determinations by anybody, correct? Well, the board of directors has the ability, it sits in its administrative body, and it has the ability to assess the evidence, whether it's written documentary evidence, the presentation of the witnesses, what the witnesses say or don't say, and make a determination as a board to uphold or reverse the executive director's decision. But the association agreed that that's the only evidence, that she just happens to be the mother of Coach Jordan Blanton. That's correct. So for instance, we don't have evidence, we were not provided evidence, the board certainly didn't have the ability to obtain evidence. Well, after the case was filed, you certainly had subpoena power through the court to look for other evidence, for example, e-mails, telephone records, other types of information that could have led to a suspicion, or maybe even reasonable cause to believe, that there was a recruitment violation. And there's no such evidence. Well, in terms of whether there was a, whether Mrs. Blanton had some other connection to the school, aside from her familiar relationship to the head coach. Did she have any other connection? There was no other connection. We agreed to that in the So we are to find an affirmative, or reverse the trial court based upon pure suspicion? I don't think it's pure suspicion, Justice Breyer. Well, what is it then? It's the IHSA board's determination that under these particular circumstances, that it was presented with in an administrative hearing, that the wrestling coach's mother provided a housing and guardianship arrangement to one of the incoming wrestlers. And that based upon upholding the intent of the rule, and looking at the term school-connected person, is the mother of the wrestling coach a school-connected person? I think it's within the IHSA board's stated that he was not aware of the housing arrangement until after it was agreed upon. Right? He did state that in the hearing. That's correct. But that would not necessarily You're basically asking us to approve the association's rewriting of its own rules. I would disagree with that. I think the IHSA What is a school-connected person? I'm sorry? What is a school-connected person? A school-connected person is in this particular circumstance, as the board determined, that the mother of the wrestling coach is a school-connected person. What about the bylaws? What's a school-connected person? It is not a defined term within the bylaws or in any of the illustrations that are provided within the anti-recruitment rule 3.070. So there was no evidence whatsoever that Mrs. Blanton was in any way in control or owed anything to the school? Correct. She was not a prominent alumnus. She was not the head of the booster club. She was not a volunteer coach for a team. Anything like that. Those would be obvious examples. But the point that we made, and we made this throughout the case, is that the IHSA board has an obligation to all the member schools to uphold its anti-recruitment rules. And if it learns of facts like this, where a student is being provided guardianship from the head wrestling coach's mother, it has to have the ability and discretion, in good faith, to determine that that is a violation of the rules, and that they can't achieve indirectly what you certainly couldn't do directly. So I don't think there would be any question that the head wrestling coach could not provide a housing or guardianship arrangement to an incoming freshman wrestler. That would be improper. What about the student athlete's wishes? In this case, it's pretty clear. The evidence shows that he wanted to go to Barium, Central Catholic. He wanted to go. He expressed that wish. And his mother and father tried their best to move into an area closer to the school, but they couldn't find suitable housing. And there's no evidence to rebut Ms. Renee Massonese's affidavit that James expressed an interest in attending Barium Catholic. We're not disputing that at all. Now, in terms of – is the question whether he was a student athlete or whether there was some – And I'd like to – As defined by 3.72. Right. I'd like to address that point, if I could, because I think this is where the circuit court made a critical error. Okay? The anti-recruitment rule contains a number of illustrations under 3.070, one of which is illustration number 149. This is quoted in our briefing. Illustration number 149 asks this question. This is interpretive guidance that's meant to help schools, coaches, parents, students understand the application of the rules. And in this case, it asks, when does a prospective student athlete become a student athlete? Answer. On the date of the first school practice in the sport involved or on the date the prospect first attends class at the school, whichever comes first. In this case, in paragraph 51 of the complaint, the plaintiffs allege – they're correct – that Jimmy Massonese started attending class at Marion Central Catholic on August 17, 2023. The guardianship was not completed through an order that was entered in the circuit court until September 27, 2023. That is a full five weeks where he was living in the Blanton home, but there was no guardianship. And for purposes of the IHSA bylaws, he's never eligible to play any sports unless he has residency as permitted under those rules. And he has to be living with parents, a custodial parent, or a guardian. So by the time he accepted that guardianship, he had been a student athlete for five weeks. So what did the circuit court do? It made a significant error. Because it didn't look in the context of the anti-recruitment rule in the bylaws in those illustrations that specifically address this situation. It looked outside the bylaws. It looked at two general use definitions that are not contained in the bylaws. Yes, they're in the handbook. They are not referenced in the bylaws. They are not incorporated into the bylaws. They are for general use. IHSA use. Correct. Yes. So if you look at the handbook, the structure is you've got the definitions appear first. Then you've got the Constitution. The bylaws follow. And at the very end, you have an array of administrative policies and procedures. In this case, the definitions are not in the bylaws. That's what the circuit court judge looked at to address this issue. He did not look at the specific illustration within the bylaws that addresses this anti-recruitment rule. And as I've shown, number 149 is bright line. It is objectively clear on when a prospective student-athlete becomes a student-athlete. Here, it was August 17. Now, go and apply that to the anti-recruitment rule 3.0725, leaving aside the question of whether Ms. Blanton is a school-connected person. It prohibits a student-athlete from receiving a so-called special inducement. Special inducement is defined. It has ten different subparts. One of them is number five. Number five talks about the offer or acceptance of a residence with a school-connected person. He was a student-athlete at the time that residence was accepted through the guardianship board. How about if it was not a school-connected person but somebody else who got guardianship? Would it still be a violation? So, for instance, if he went to live with an aunt or a close relative? No. Well, you'd have to determine whether he met the residency bylaw. That's a separate issue, but that would not be a recruiting violation. So it wouldn't be a recruiting violation if he had coached or he had worked with the coach during the summer and then he moved in with his godmother, say, in Chitok guardianship. Then he started school and started on the wrestling team. That wouldn't be a recruitment? It wouldn't be unless you had some evidence that there was direct efforts to recruit the student. So how is there direct evidence now that they were going to recruit the student? You don't need it. You don't need it. You don't because of the connection between the acceptance of the residence and the school-connected person. So this is not a bylaw that necessarily—it does not look at whether there was a specific intent to recruit a player for an athletic purpose. That could either be 3.071 or 3.073. 3.072 is totally different. You don't look at the intent to recruit. You don't look at what was the coach trying to accomplish or what was someone else affiliated with the school trying to accomplish. You look at whether there was a special inducement. That is the central question. So here the special inducement was the offer and acceptance of housing with Ms. Branton. So you don't need to look at the circumstantial evidence or the direct evidence of who was talking to whom when and what was their purpose in trying to get this kid over to the school. You just don't need it. Inducement still has to be done by someone connected with the school. If there was an effort to recruit someone over? By someone connected with the school. Yes, you have to look at the language of 3.071 and 3.073, which talks about attempts to induce students to come to a school for an athletic purpose. That's different than what you're looking at. Totally different. Totally. Because here you do not need to look at the evidence of what's the intent to recruit a student. You're looking at whether a special inducement existed. And a special inducement could take a variety of different forms, and there's 10 different subparts to this particular rule. And mothers and coaches are not a listed person, right? They're not what? A person associated with the school. I'm looking at 3.70, 070. So if that's the gray shaded section at the top of the rule, that is actually not part of any of the three subparts that talk about what are the specific recruiting violations. Now, there are illustrations at the top that were in the testimony trials that was added before the 23-24 school year, but there are references to coaches, teachers can't have communications with AAU coaches, for instance, or club coaches, but that does not reference family members of coaches or other school personnel to answer your question. In addition to Jimmy, Mr. Anderson testified that there were three other students investigated who were transferring to Marion Central who were all wrestlers. Correct. And they all were accepted. Correct. They were deemed to be eligible. There was no issue. But there were no recruiting violations there. That's correct. That's correct. And that, I believe, is documented in our fact-finding report that was submitted to the trial court as substantive evidence along with his trial testimony. So he began by clearing, I think they were from Grayslake and Belvedere, if I'm not mistaken. He began by clearing those other students where this investigation had taken place. A fact-finding conference was held at Marion Central with the coaches, administrators, parents, found no issue with respect to those students' eligibility to wrestle, and then it turned to Mastney, who was an incoming freshman, not a transfer student. Those others were transfer students, but he was an incoming freshman at the time, and that's where the fact-finding then developed into the guardianship and the ruling of ineligibility. Your Honors, I see that I'm out of time. If there are no further questions. Any other questions? Just one second. Okay. So basically you're saying the trial court erred in its interpretation of your bylaws. That's the bottom line, correct? It did err in terms of the judgment. It erred in terms of applying the undisputed facts to the bylaw terms and raising issues. But the mother wasn't connected. The court never addressed that. Okay. The judgment never addressed that issue. But you're saying that's the only issue. That's the only issue in the case. That was always the only issue in the case in which the IHSA board made its determination to plead its complaint for declaratory relief. Go ahead. And so the issues in the judgment, there were three. None of those were ever raised. Okay. So the school, excuse me, the circuit court did not ever address whether Ms. Blanton was a school-connected person. But that was the only theory raised. The stipulation, the trial memorandum reflects that. The order on the trial conference accepted those stipulations as binding and determinative of what we were trying the case over. So, Justice Shostak, to answer your question, no. The court didn't address it. But I think this court can. It doesn't need to remand and have another determination from the circuit court. It's got a full record. It's got everything the circuit court had, and it can do it here. But it should not be, the trial court should not have looked at those other issues that form the basis for its judgment. In the sanctioned letter and the letter of the affirmance, the association did not raise any sort of continuing violation theory, which you basically raised here, that it wasn't just Jordan's mother making the offer. It was beyond that. It was when he continued to live there. But that was not a theory that was in the sanction. So there's the eligibility ruling. That's December 13th from the executive director. From there, there's an expedited appeal, and the board of directors then issues an affirmance. Affirmance, right. And so the practice, as was testified, is that the board essentially conducts the hearing, the administrative hearing, provides its reasoning and rationale to the executive director, who offers a letter reflecting that reasoning. And that was what the trial exhibit showed. Now, in terms of what is the basis or reasoning or rationale, I think what the affirmance letter looked at was, to simplify, you cannot do through the coach's mother what you would be prohibited from doing directly through the coach. But my point is that you argued here that he became a student athlete after that, after he accepted the offer of residence. No, he became a student athlete the day he started attending class at Marion Center. Right, that's what I'm saying. Yes, correct. But he wasn't the student athlete at the time that the association said the violation occurred. No, the association said the violation occurred in, I believe it was December 13th. That's when the ruling letter went out. He had been wrestling at that time. No, I know that. I'm saying they said the violation occurred when he accepted the residence. Am I wrong about that? I'm sorry. I'd have to look back at the letter. That's my recollection of the letter. So I think this is the relevant portion. Based on the information above, it is my conclusion that Coach Blanton and Marion Central Catholic violated Bylaw 3.070 through the family's offer and acceptance of lodging and guardianship of Jimmy Masti for school attendance and participation in wrestling. Right. So it doesn't specify a date? Okay. There's such a thing as notice, providing notice. The notice you're providing is that the violation occurred when you accepted. And what I would say is the number of schools the IHSA appointed the Board of Directors as an administrative body to enforce its eligibility rules and conduct hearings. Juries don't give their reasoning when they render a jury verdict. I think the basis for its determination was clear. The plaintiffs challenged it. They had every ability to challenge it before the Board of Directors appeal. It was a lengthy appeal hearing. Then they could challenge it again in court. So I think notice, while I would disagree, I do think notice was proper. Thank you. Anything else? Counsel, when you're ready. Good afternoon, Your Honors. May it please the Court. I think the position of the athletes can be best summarized by an argument that the IHSA actually themselves raised within their own brief. At page 21, when talking about the trial court looking at the interpretation of how these rules apply to middle school students or, you know, students that are incoming into their freshman year, the IHSA makes this argument that, and this is a quote here, such a shift would need to come at the behest of IHSA member-initiated legislation when you're talking about a seismic shift in policy. Our position effectively can be summarized by that same sentence. Our whole position is that the IHSA has every right to make the rules that they want here and to enforce those rules if they were to make them, but that if they want a rule that says the family of school-connected persons cannot give these benefits, if they want to have rules that say you are prohibited from giving these benefits not only to current student-athletes, but to incoming student-athletes, to eighth-graders, to people that are in the middle of their summer, such a seismic shift in IHSA policy would need to come at the behest of IHSA member-initiated legislation. So if the IHSA is going to hang their hat on that position, that this is a massive change in policy and it has to be voted on, I think that sword cuts both ways. This is true of all three issues that my colleague raised at the beginning of his argument. It applies to the 3.070 on persons associated with the school, 3.072 on persons connected with the school, and 6.010 on the penalties for accepting certain inducements from persons who are school personnel. These terms have, some of them have fixed definitions within the bylaws. And the IHSA seeks to go well beyond any rational plain language reading. How about the handbook? Can't we look at the handbook? When we're talking about the bylaws, the bylaws in the handbook I think are interchangeable there because those are contained within there. The biggest issue, and I think it's the most vague or ambiguous, is the bylaws, for example, define. I think the trial court got it right. A student athlete is a person who has started practice. If you read the definition of student athlete, nowhere in there would it tell you that this applies to students who are enrolled but have not yet started participation in activities. And now the IHSA wants to say, but we have this illustration that makes the rule applicable to students who have not yet started athletic participation. The issue I have with that is that position is completely opposite to what the IHSA argued at the trial court level. When the IHSA was talking about and defending why is there no illustration that would tell a person that school-connected persons include family members, they said, well, the illustrations are just that. They're illustrations. They're not rules. They're not binding. They're just there as a set of examples. And the executive director, when he testified at trial, doubled down on that position repeatedly, that this is not meant to be a rule. It's an explanation. I think if you — Can we make a reasonable inference with some of these definitions you're looking at? I mean, could circumstantial evidence come into play, you know, reasonable inferences? I think it could. And, you know, in candor, that's why the complaint as it was drafted focused on, I think, what is the most obvious and glaring of the issues with the IHSA's interpretation of their bylaws, which is the definition of school-connected person. I don't think there's any circumstantial evidence, anything, that can get you to the conclusion that by virtue of mere familial relation alone, a person is connected with the school. I mean, and we've raised this to the trial court level. We've raised this in our brief. The number of people who would be walking around the state completely unaware that they have connections or associations with schools and can subject those schools and teachers and students to penalties because they have a family member who's a high school employee. You're talking about tens or hundreds of thousands of high school employees with potentially millions of family members walking around the state of Illinois. I, myself, am a child of a public school teacher. My mom teaches down the road at Bartlett High School. She coaches tennis. Does that mean if I have a tennis student do an internship at my office for the summer that I have now subjected Bartlett High School, with whom I have absolutely no relationship to penalties by the IHSA? Can you address counsel's argument that the trial court ruled on a theory that you did not plead in your complaint? Yes, and we spent some time, I think, articulating what constitutes a theory here, and we differ on what the word theory means. Under their analysis, theory is really any argument or conclusion or interpretation. We think a theory means something much more stringent. A theory is the cause of action and the underlying basis for the cause of action. Otherwise stated, a theory has elements, right? If a person is charged with battery, there's two theories of battery. There's causing bodily harm and there's insulting or provoking contact. But each of those things have their own independent elements. When looking at all of the cases cited, you're looking at the difference between breach of contract versus anticipatory repudiation. Those two things have their own independent sets of elements. But what he said here, Mr. Venko said, is the only reason, the only issue that was to be before the court was, was he living with someone connected to the school. And it appears to me from the ruling of the court that they went well beyond that. To a certain degree. Within the brief we've cited the cases that make clear that if the stipulation rises to the level of confining the court to conclusions of law, that the stipulation is not controlling. Our view is that the issue that the court ruled on, the theory, is the same thing that we planned. It is that the IHSA was arbitrary and capricious in their application of bylaws to this specific set of facts. And the court simply had a different reason for getting there. So our view is that to the extent the stipulations could be construed as confining the court to something tighter than that theory, arbitrary and capricious interpretation, that it is now subjecting the court to a conclusion of law that the appellate courts have previously held is not binding upon the trial court. So we think the trial court could go beyond that confine and look at other reasons that thought this particular act was arbitrary and capricious under the bylaws. But even if all three of you said no to that, it still comes down to the fact that the appellate court can affirm for any basis on the record, and we stand firmly on our position that the argument that we raised from day one all the way through trial was correct. So even if the court disagreed that the trial court could do what it did, I think this court has all of the tools necessary to affirm anyways. Let me ask you this question. You must be aware that Mons versus Illinois High School Association was vacated? Correct. Why did you cite it in your briefs then? For persuasive reasons only, there's some facts and some analogies that I think are applicable, and part of it, too, is that the Mons case is cited and relied upon by other cases, including ones that are specifically involving the IHSA, which are still considered good law. So it's there for persuasion, and quite frankly, it was something that had been from the get-go before it had been reversed. You know, raised at the TRO phase, it was one of the court cases that was cited throughout the course of the trial. So I don't think the court has to rely on that at all. The Supreme Court ordered our court to vacate, the appellate court to vacate its judgment and consider whether or not the issue was moved because the child or the student had graduated. Correct. But I think it's exempt. I mean, is there authority saying you can cite a vacated opinion for its persuasive value? For its factual comparison, I believe that we can. I mean, we're not asking the court to say, yes, the Supreme Court told us to reverse this, but we're going to rely on it anyways. It allows, or at least the court allows this court, because there are really few cases that have ever come up on appeal on these kinds of athletic association decisions. So the court has a very narrow pool of cases to look at to see what kinds of facts have come up before. And, you know, even if the court can't rely on the decision of Monts, I think fundamentally the arguments that were raised by the attorneys, by the counsel, by the parties in that case still hold water if the decision of the appellate courts does not. Other than that, a couple of the things that I think I want to focus on in response to the arguments. You know, there was some discussion about whether the IHSA had subpoena power to go look for more information about this relationship between Stacey Blanton and the school. And the only reason to push back on that a little bit is because one of the arguments that we raised to the trial court, and it's how we got to this confined list of issues for trial, is that when evaluating whether a decision by the IHSA is arbitrary and capricious, our view is that the trial court has to look at the information available to the IHSA at the time. The IHSA can't go into a hearing, their own internal hearing, with zero evidence, make an arbitrary, capricious decision, wait for the lawsuit to come, and then use the subpoena powers of the court as a means to go back and retroactively justify and make not arbitrary and capricious their prior, you know, erroneous decision. This is also the reason why we put a lot of time into arguing against the IHSA's position that the court's discovery orders were erroneous. We believe the court has a great amount of authority to control discovery, and we think as a matter of public policy, it makes sense that courts would say, you as a judge, you get sued, pursue discovery, and then find all this information in discovery that you're going to take out of the litigation to make a brand new decision. They could have used information in discovery in the trial of this case, though, right? We actually disagree with that, because we think that the court, when deciding whether the decision was arbitrary and capricious, has to look at the information available to the association at the moment in time it made the decision. Whether or not it's decision Okay. I'm sorry. It was just to clear that up for me. Okay. One of the other things that I think I would want to focus on, you know, the court had made some comments about whether or not Jimmy would or would not have gone to Marion, his efforts that he wanted to go to this school. One thing that is not contained anywhere in the trial records, I think I would push back a little bit on the court making this conclusion, is that they had run out of options, and Stacey Blanton was the last person that Jimmy could go live with. What the record actually shows is that his parents had been looking at a way to get him to Marion. They had looked at moving out there themselves. During the process of looking to move out there, Stacey offered her home, and they stopped their efforts. So, really, the trial court had no idea. I think this court has nothing before it to decide if Stacey Blanton had not offered guardianship and housing, whether or not Jimmy would have gotten there anyways. I think under the record that the court has, maybe he would have, maybe he would not have, but there's at least a possibility on the record that his parents would not have stopped looking to get him there themselves had Stacey Blanton never offered guardianship. So there's at least a fair possibility that he would have wound up there anyways without the benefit of housing and guardianship. I think it was my closing thought, I've still got a couple of minutes here, but the IHSA pushed back on some assertions from this court regarding whether bylaw 3.072, that's your inducement rule, requires essentially an improper purpose. They're arguing that a violation of other bylaws requires a recruitment purpose, that violations of bylaw 3.072 are kind of like strict liability issues. You don't have to prove any improper intent. It's automatic. I think that argument is obviated by their own brief. At page 25 of their brief, when discussing the trial court's interpretation of bylaw 3.072, they literally used the term athletic purpose in describing why this rule exists. The IHSA says that the decision of the board of directors should have been foreseeable to Jimmy and to Jordan because that resulted from an IHSA's obligation to prevent improper recruitment of students for athletic purposes. So their own brief admits that the whole function of rule 3.072 and the entire body of this page of the bylaws is related to athletic purposes. There was no connection or relationship between Stacey Blandt and the school. Neither the school nor Jordan had any ability to control what she did or did not offer. Unlike every single person listed in that non-exhaustive list in 3.070, teachers, principals, schools, personnel, boosters, volunteers, what have you, every person on that list shares a single common thread, which is that the school has the ability to either control their behavior and if they do not bring themselves into compliance, the school can terminate and sever their connection. But doesn't, I mean, the mother of the coach, doesn't it appear like some sort of, like an inducement, if you will? We conceded that at the outset. I think if you give it like the initial glance, I think most rational people would look at this and say, something about this smells a little funny. It doesn't pass the smell test. But that's not a basis to make a rationed, arbitrary decision. It's a reason to go back, to look at your bylaws and to decide, does this actually apply? And our position is it's not what they did. They started with the conclusion that they wanted, that this is improper, and they worked backwards to find the interpretation they needed to get there. And in doing so, they went beyond the plain language of the rules. If there's nothing further, we respectfully ask this Court to affirm. Thank you. Thank you. Counsel, whenever you're ready. Just briefly in response, Your Honor, the issue came up about what were the issues presented at trial and did the judgment stray from the theory that was pled in the complaint? We cited, and counsel distinguished, a number of cases from this district that talked about, well, if the circuit court's entering a judgment on a theory that was not in the case, that's improper and warrants reversal. By themselves, those cases are sufficient. But what we have here is additional filings by the parties that move it into a whole other realm. And what I mean by that is we have trial stipulations. We have a joint trial conference memorandum, and we have an order on trial conference, all submitted within a week or so before the actual trial where Mr. Anderson testified. Those documents make it clear that the parties agreed what the issue for trial was. It wasn't to determine whether Jimmy Mastey was a student athlete or to argue that point to the court or to evaluate evidence that might reflect on certain dates that he attended or practiced or participated in events at Marion Central. We weren't going there. We were going with a very single issue that was pled. It was addressed at the TRO hearing. It was addressed in the closing arguments. It was stipulated to as the issue for trial. So this is a quote from the Illinois Supreme Court in the Village of Kildare case from 1960 that I've quoted in our brief, and it really encapsulates the entire issue. Where the parties by stipulation prescribe the issues on which the case is to be tried, this amounts to a binding waiver or elimination of all issues not included in the stipulation. So while the cause of action was the same, it was a complaint for declaratory relief, the theories that the circuit court relied upon were not contained within the complaint. They were not contained within the trial stipulations, the trial conference memorandum, or the closing arguments. If you read the closing argument, which is we did written closings in this case, counsel very cogently summarized the issue. It focused on one issue, the issue we had been talking about, whether Ms. Blanton was a school-connected person. That was the expectation that the parties had over what the issue would be for trial. It was not the issues that formed the basis for the judgment. And again, the judgment didn't make any reference to whether Stacy Blanton was a school-connected person. To address that point, I know we did cover this at some length, but I just want to reiterate that the IHSA cannot be in the position to predict ahead of time each and every possible permutation or connection that someone may have to the school. It has to be able to use its discretion to determine under the particular facts presented to it whether the person is a school-connected person for purposes of the anti-recruitment bylaw. There certainly will be hypothetical scenarios that are present in this case which appear absurd. I grant that. We talked about that at the trial court, particularly at the TRO argument, and counsel raised it again in his closing brief, as to why certain examples of someone who may have some attenuated connection to the school couldn't logically be a school-connected person. And if that were the case, then there is the ability for judicial review and an arbitrary and capricious finding. But I will submit that here, given the close familial connection, the wrestling coach's mom, it was reasonable for the Board to conclude that under these particular circumstances, that met that term within Bylaw 3.072. Doesn't it have to be based on some evidence, not just by, gee, I just don't think this sounds right? And I think it's – I do think it's based on evidence of the relationship. Now, as Justice Burkett pointed out, we don't have her as the head of the school booster program or some other connection. I mean, the connection is the relationship to the head coach. I mean, I don't even know in the record if he's spoken to his mother in the last 20 years. There's nothing there. He's a co-coach, not a head coach. Hold on a second. My point is, we don't know that he and his mother have any kind of relationship. The only thing I do know from this record is Stacy Blanton and Renee Mastey had a relationship. She may never speak – she may absolutely despise her son for all I know based on this record. So how do I justify an exercise of discretion which, based on this record, would be made out of thin air? I don't think it's made out of thin air. And I have to go back to what was before the Board at the time of the hearing. The Board heard all the evidence. It heard from all the people that were involved. It asked questions. Counsel presented their arguments. And I think given the circumstances plus the connection between Coach Blanton – may I finish? Sure, sure. Between Coach Blanton and Ginny Mastey at the very time that they were – he was coaching them over summer events at that same exact time that the parents – With all due respect, counsel, that's a relationship between the coach and the young man. Nothing to do with his mother. Yeah, and what I would say is what I've said before is that – I can give you the last word if you – Yeah, I think that given the Board has been appointed as an administrative body, it has to have the discretion to interpret and apply the rule to particular facts. These are unusual facts that are heard. And so I think that it has that discretion and it has that ability based on the evidence it heard to make the decision. Any further questions? Anything else? Thank you. Counsel, thank you. We will be adjourned then for the day at the conclusion of our fifth argument this afternoon – or today. But I think both counsel – really great arguments made by both sides today on a very interesting and somewhat obscure issue. Thank you. All rise.